## COMMERCIAL REAL ESTATE SALE CONTRACT

**THIS DOCUMENT IS MORE THAN A RECEIPT FOR MONEY. IT IS INTENDED TO BE A LEGALLY BINDING AGREEMENT. READ IT CAREFULLY.**

THIS AGREEMENT is made and entered into as of the ~~13th~~ 10th Day of ~~December 2022~~ January, 2023 by and between "Owner of Record" Guadalupe Arce ("Seller") and Tavern on LaGrange Corp. an Illinois Corporation and or assignee ("Buyer") for the purchase of that certain land and improvements thereon (collectively referred to as the "Property") located in County of Cook, State of Illinois, and more particularly described as follows:

5403 S. LaGrange Countryside, IL 60525

PIN NUMBER(S) 18-09-412-001-0000; 18-09-412-002-0000; 18-09-412-022-0000; 18-09-412-023-0000

### TERMS AND CONDITIONS

Seller agrees to sell the Property, and Buyer agrees to purchase the Property, on the following terms and conditions.

1) **PURCHASE PRICE:** The purchase price for the Property's will be is ONE MILLION SEVEN HUNDRED AND FIFTY THOUSAND dollars ($1,750,000.00) (CASH DEAL) which shall be paid by certified or cashier's check or wire transfer at closing pursuant to the terms stated herein

2) **DEPOSIT:** Upon the acceptance of this Agreement, Buyer will simultaneously deposit the initial sum of Twenty Thousand 00/100 dollars ($20,000.00) in the form of Cashiers Check with Lillig & Thorsness, Ltd. ("L&T"), as Escrowee, pursuant to the terms of that certain earnest money escrow agreement between the parties and L&T, attached hereto as Exhibit "1". If said $20,000.00 Deposit is not paid for any reason, this Contract shall terminate and Buyer shall move-out of the Property.

   This sum is a deposit ("Deposit") to be credited against the purchase price of the Property at closing.

3) **CLOSING:** Closing shall take place on ~~January 30, 2023~~ March 15 OR WITHIN 60 DAYS FROM SIGNED AGREEMENT FROM SELLER at the office of Chicago Title Insurance Company ("Closing Agent") located at 5 Westbrook Corporate Center Ste 100, Westchester, IL 60154 or such other location as the parties shall mutually agree. Seller and Buyer agree to prepare and execute such instructions as may be necessary and appropriate to close the transaction. Should the instructions fail to be executed as required, Closing Agent shall and hereby is directed to close escrow pursuant to the terms and conditions of this Agreement. "Closing Date" shall mean the date on which the deed transferring title is recorded, which shall occur on ~~January 30, 2023~~ OR WITHIN 60 DAYS March 15 DAYS FROM SIGNED AGREEMENT FROM SELLER. Closing fees shall be paid by (AS CUSTOMARY). All other closing costs shall be paid in 60 accordance with the custom in the county in which the Property is located. At closing, both Buyer and Seller shall deliver or cause to be delivered to the other the following: 1) Real Estate Transfer Declaration; and 2) such other documents, instruments and amounts as may be reasonably required to carry out the terms and intent of this Agreement.

4) **PRORATIONS:** Real estate taxes for the year ~~2021~~ 2022 and 2023 shall be prorated based on 110_% of the most recent ascertainable taxes [ X] such prorations to be final.

   **LEASED PROPERTY PRORATIONS:** $15,000.00 being paid for use and occupancy shall be prorated as of the closing date.

5) **TITLE:** See Exhibit "2". Within Five (5) days following the execution thereof, Buyer shall either approve in writing the exceptions contained in said title report or specify in writing any exceptions to which Buyer reasonably objects. If Buyer objects to any exceptions, Seller shall, within Five (5) days after receipt of Buyer's objections, deliver to buyer written notice that either (i) Seller will, at Seller's expense, attempt to remove the exception(s) to which Buyer has objected before the Closing Date or (ii) Seller is unwilling or unable to remove any such exception by the Closing Date, in which event Buyer may elect to terminate this Agreement and receive back the entire Deposit, and Buyer and Seller shall have no further obligations under this Agreement; or alternatively, Buyer may elect to purchase the Property subject to such exception(s).

   Seller shall convey by [ xxxx] Warranty Deed to Buyer (or to such person or entity as Buyer may specify) marketable fee title subject only to the exceptions approved by Buyer in accordance with this Agreement. Title shall be insured by a standard owner's policy of title insurance with extended coverage issued by Title Company in the amount of the purchase price with premium paid by Seller.

6) **FINANCING/APPRAISAL CONTINGENCIES: NONE**

7) **PERSONAL PROPERTY: NONE**

8) **CONDITION OF PROPERTY:** It is understood and agreed that the Property is being sold "as is"; that Buyer has, or will have prior to the Closing Date, inspected the Property; and that neither Seller nor Agent makes any representation or warranty as to the physical condition or value of the Property or its suitability for Buyer's intended use.

   BUYER'S INITIALS _____

9) **INSPECTION CONTINGENCIES: NONE**

**10) DEPOSIT TRANSFER: NONE**

**11) SURVEY:** Five (5) days prior to the Closing Date, Seller shall furnish at Seller's expense, existing survey, acceptable to Chicago Title Company by a licensed land surveyor, showing the present location of all improvements and encroachments, if any. Buyer will accept an existing survey, which may not be current, with an affidavit of no change, provided that such survey (a) is intelligible, (b) includes and properly locates thereon easements and other title exceptions included in the title commitment, (c) is acceptable to Buyer's lender, if any, and (d) is in sufficient detail to enable the Title Company to remove any survey related general exceptions included in the title commitment and is otherwise acceptable to the Title Company.

**12) RISK OF LOSS:** Risk of loss to the Property shall be borne by Seller until title has been conveyed to Buyer. In the event that the improvements on the Property are destroyed or materially damaged in excess of eighty (80) percent of the building improvements between the Effective Date of this Agreement and the date title is conveyed to Buyer, Buyer shall have the option of demanding and receiving back the entire Deposit and being released from all obligations hereunder, or alternatively, taking such improvements as Seller can deliver. ~~Upon Buyer's physical inspection and approval of the Property, Seller~~ shall maintain the Property through closing, in the same condition and repair as approved, reasonable wear and tear excepted.
Buyer

**13) ESTOPPEL CERTIFICATES: NONE**

**14) POSSESSION:** Buyer is currently in possession of Property and shall continue to make monthly payments of $15,000.00 pursuant to current use and occupancy payments. If said payments are not made by the 7th of each month Seller may declare a default and terminate this Agreement

**15) LIQUIDATED DAMAGES/NON-REFUNDABLE DEPOSIT:** The Deposit is non-refundable as the Buyer and Seller agree that it would be impracticable or extremely difficult to fix actual damages in the event of a default by Buyer, that the amount of Buyer's Deposit hereunder is the parties' reasonable estimate of Seller's damages in the event of Buyer's default, and that upon Buyer's default in its purchase obligations under this Agreement not caused by any breach by Seller, Seller shall be released from its obligation to sell the Property and shall retain Buyer's Deposit as liquidated damages, which shall be Seller's sole and exclusive remedy in law or equity for Buyer's default if the sale does not close by ~~January 30, 2023~~ March 15 or within ~~30~~ 60 days from signed Agreement

Buyer's Initials _____    _____ Seller's Initials

**16) AGENCY DISCLOSURE:** The only Agent referred to in this agreement is the Title Agent.

**17) BROKERS: NONE**

**18) DISCLOSURE OF REAL ESTATE LICENSE:  None**

**19) COMPLIANCE WITH LAWS:** The provisions of the Uniform Vendor and Purchaser Risk act of the State of Illinois shall be applicable to this Agreement. Buyer and Seller agree to make all disclosures and comply with applicable provisions of local or state law, as amended, and any local ordinances with respect to transfer taxes.

**20)    LIMITATION OF LIABILITY: NONE**

**21)    SCOPE OF AGENT'S AUTHORITY AND RESPONSIBILITY: NONE**

**22)    AGENT DISCLAIMER: None**

**23)    ARBITRATION OF DISPUTES: Omitted**

**24)    SUCCESSORS & ASSIGNS:** This agreement and any addenda hereto shall be binding upon and inure to the benefit of the heirs, successors, agents, representatives and assigns of the parties hereto.

**25)    ATTORNEYS' FEES:** In any litigation, or other legal proceeding which may arise between any of the parties hereto, including Agent, the prevailing party shall be entitled to recover its costs, including costs of arbitration, and reasonable attorneys' fees in addition to any other relief to which such party may be entitled.

**26)    TIME:** Time is of the essence of this Agreement.

**27)    NOTICES:** All notices required or permitted hereunder shall be given to the parties in writing and their respective attorneys (with a copy to Agent) at their respective addresses as set forth below. Should the date upon which any act required to be performed by this Agreement fall on a Saturday, Sunday or holiday, the time for performance shall be extended to the next business day.

**28)    FOREIGN INVESTOR DISCLOSURE:** Seller and Buyer agree to execute and deliver any instrument, affidavit or statement, and to perform any act reasonably necessary to carry out the provisions of the Foreign Investment in Real Property Tax Act and regulations promulgated thereunder. Seller represents that Seller  is  X  is not a foreign person as defined in Section 1445 of the Internal Revenue Code and withholding of any portion of the purchase price  is  X  is not required.

**30) ACCEPTANCE AND EFFECTIVE DATE:** Buyer's signature hereon constitutes an offer to Seller to purchase the Property on the terms and conditions set forth herein. The "Effective Date" of this Agreement shall be the later of (a) the date on which Seller executes this Agreement, or (b) the date of written acceptance (by either Buyer or Seller) of the final counter-offer submitted by the other party.

**31) GOVERNING LAW:** This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois.

**32) NON-DISCRIMINATION:** Buyer and Seller acknowledge that it is illegal for either Seller or Buyer to refuse to lease or sell to any person on the basis of race, color, religion, national origin, sex, marital status or physical disability.

**33) OTHER TERMS, DISCLOSURES AND CONDITIONS:** Seller agree to dismiss current Chapter 11 claim against Tavern on LaGrange Corp. upon the closing of this transaction.

Seller shall not be required to comply with environmental or Buyer's lender requirements, if any.

**Seller Termination Option:** If monthly Use & Occupancy ($15,000.00) is not timely received on the 7th date of the month by Seller prior to closing, Seller can either take a proration credit as of the Closing Date for amounts due or terminate this Contract and retain the Deposit as Liquidated Damages.

Unless this transaction closes by March 15, 2023, Buyer shall promptly move-out of the Property on April 3, 2023, pursuant to the Agreed Settlement (Eviction) Order entered on JANUARY 10, 2023 in case #2020M5-04317.

**THE PARTIES ARE ADVISED TO CONSULT THEIR RESPECTIVE ATTORNEYS WITH REGARD TO THE LEGAL EFFECT AND VALIDITY OF THIS PURCHASE AGREEMENT.** The undersigned Buyer hereby offers and agrees to purchase the above-described Property for the price and upon the terms and conditions herein stated. This offer is made by Buyer to Seller on this 17th Day of August 2022. 6th January, 2023.

Buyer hereby acknowledges receipt of an executed copy of this Agreement.

**BUYER:** _(signature)_

TAVERN ON LAGRANGE CORP, an Illinois Corporation

**ADDRESS:** 5403 S. LaGrange Road
Countryside, IL 60525

**SELLER:** _(signature)_

**GUADALUPE ARCE**
**INDIVIDUAL**

**ADDRESS:** 11027 W 151st Place
Orland Park, IL 60462

(SELLER:) _(struck through)_

DATE OF OFFER: December 13, 2022 _(struck through)_

EFFECTIVE DATE: December 23, 2022 _(struck through)_

ATTORNEY FOR BUYER:
Robert A. Hall
BISHOP & LAFORTE, LTD.
1 S 450 Summit Av, Ste 325
Oakbrook Terrace, IL 60181
Telephone: 630-916-0123
Facsimile: 630-916-0567
rhall@bishoplaforte.com
www.bishoplaforte.com

ATTORNEY FOR SELLER:
Russell R. Custer, Jr.
Llillg & Thorsness, Ltd.
1900 Spring Road, Suite 200
Oak Brook, IL 60523
Telephone: 630-571-1900
Facsimile: 630-571-1042
rcuster@llllliglaw.com

ATTORNEY FOR SELLER:
RUSS CUSTER
Lillig & Thorsness, Ltd.
1900 Spring Road, Suite 200,
Oak Brook, IL 60523
Email: RCUSTER@lilliglaw.com
630.571.1900
630.571.1042

Exhibit "1"

**LILLIG & THORSNESS, LTD.**
**Earnest Money Escrow Agreement**
**Single Deposit**

Commitment No: 22NW170139 4WF (Chicago Title)

THIS EARNEST MONEY ESCROW AGREEMENT ("Agreement") is made as of January ___, 2023, by and among Unique Property Holdings, LLC an Illinois limited liability company ("Buyer"), Guadalupe Arce ("Seller"), and Lillig & Thorsness, Ltd. ("Escrow Agent").

**RECITALS**:

A.   Pursuant to that certain Commercial Real Estate Sale Contract dated January ___, 2023 by and between Seller and Buyer (the "Contract"), Buyer is depositing with Escrow Agent earnest money in the amount of $20,000.00 by cashiers check payable to Escrow Agent ("Funds"). A true and correct copy of the Contract is attached as **Exhibit A**.

B.   Escrow Agent shall hold the Funds in a non-interest bearing account.

**THE PARTIES AGREE**:

1.   **Recitals**: The above recitals are incorporated below as if set forth at length.

2.   **Release of the Funds**:   Escrow Agent shall hold the Funds until the first of the following events:

    A.   On the closing of the sale of real estate, or upon Buyer's default, as described in the Contract, Escrow Agent shall deliver the Funds to Seller as part of Buyer's purchase money, or as liquidated damages if the closing does not occur because of Buyers default.

    B.   On receipt of joint written instructions from Buyer and Seller directing Escrow Agent to disburse the Funds to a named party, Escrow Agent shall disburse the Funds as directed in such notice. Upon such disbursement, Escrow Agent shall have no further liability under this Agreement.

    C.   In the event Escrow Agent does not receive joint written instructions on or before the date for closing, as described in the Contract, Escrow Agent shall continue to hold the Funds until the first of the following events:

        i.   Receipt by Escrow Agent of joint written instructions from Buyer and Seller to disburse the Funds to a named party (upon receipt of such notice, Escrow Agent shall make the disbursement as directed in the notice);

        ii.   Delivery of the Funds by Escrow Agent, at Escrow Agent's sole discretion, to a court of competent jurisdiction. Such delivery may be by interpleader or other writ or petition. Buyer and Seller agree that, after the Funds and interest, if any, are delivered to court under this paragraph, Escrow Agent shall have no further liability under this Agreement and shall not be a necessary or permitted party in any action brought regarding the Funds;

        iii.   Entry and receipt by Escrow Agent of an order of a court of competent jurisdiction ordering Escrow Agent to deliver the Funds (upon receipt of such order, Escrow Agent shall make the disbursement as directed in the order); or

        iv.   Receipt by Escrow Agent of a notice of default in conjunction with the Contract from Seller. Escrow Agent shall make the disbursement to Seller as directed in said default notice as liquidated damages.

3. **Escrow Agent's Costs and Expenses**: In addition to the provisions set forth in Paragraph 2, above, in the event that Escrow Agent is requested to release the Funds prior to the closing of the sale of the Property, Escrow Agent shall be entitled to deduct from the amount to be released all of Escrow Agent's costs and expenses, if any, incurred in conjunction with the administration of its escrow duties described herein.

4. **Liability of Escrow Agent**: Escrow Agent shall not be liable for: (i) any act or omission done in good faith under this Agreement, nor (ii) any loss arising out of loss or impairment of the Funds in the course of collection or while on deposit with a bank due to bank failure, insolvency or suspension, except as shall result from failure of the Escrow Agent to comply with written closing instructions from the Seller and Buyer to deposit the Funds in a bank which the Seller and Buyer designated by name. Buyer and Seller agree to, jointly and severally, hold Escrow Agent harmless for all reasonable actions taken by Escrow Agent in accordance with this Agreement. In addition, Buyer and Seller further agree to pay all expenses of Escrow Agent, including reasonable attorneys' fees, which may arise pursuant to or out of a dispute with reference to the rights of anyone claiming an interest in the Funds deposited under this Agreement.

5. **Action Against Escrow Agent**: The parties agree that any action in relation to an alleged breach of this Agreement by Escrow Agent shall be commenced within one year of the date of the breach, without regard to the date the breach is discovered. Any action not brought against Escrow Agent within that one year time period shall be barred, without regard to any other limitations period set forth by law or statute, and the Buyer and Seller hereby waive any statute of limitations to the contrary.

6. **Counterparts**: This Agreement may be executed in counterparts. When each party has executed a copy of this Agreement, the executed copies taken together shall have the same force and effect as if executed in one document. Facsimile signatures on this Agreement shall be deemed original signatures.

7. **Notices**: Any notice required under this Agreement shall be given in writing at the addresses set forth at the end of this Agreement and by: (a) certified or registered mail, postage prepaid, (b) overnight courier guaranteeing next day delivery, (c) personal delivery, or (d) facsimile. All notices shall be deemed given three (3) business days following deposit in the United States mail with respect to certified or registered letters, one (1) business day following deposit if delivered to an overnight courier guaranteeing next day delivery and on the same day if sent by personal delivery or facsimile (with proof of transmission).

8. **Binding**: The terms, covenants and conditions of this Agreement shall bind the parties and their respective successors, heirs and assigns.

**SELLER:**

Name: Guadalupe Arce
Address: c/o Lillig & Thorsness, Ltd.
1900 Spring Road, Suite 200
Oak Brook, Illinois 60523
Phone: (630) 571-1900
Fax: (630) 571-1042

**ESCROW AGENT:**

By:

Name: Lillig & Thorsness, Ltd.
Title:
Address: 1900 Spring Road, Suite 200
Oak Brook, Illinois 60523
Phone: (630) 571-1900; Fax: (630) 571-1042

**BUYER:**

Name: Unique Property Holdings, LLC an Illinois
limited liability company
Address: c/o Bishop & LaForte, Ltd.
1S450 Summit Avenue, Suite 325
Oakbrook Terrace, Illinois 60181
Phone: (630) 916-0123
Fax: (630) 916-0567

Page 2 of 3

**Exhibit A**
**Offer to Purchase**

**OLD NATIONAL BANK**
Your bank. For life.

2160070

71-1/863

REMITTER

BRANCH #_____

DATE

TAVERN HOSPITALITY GROUP

December 13, 2022

PAY TO THE
ORDER OF    **LILIAG & THORSNESS**

$20,000.00

**Twenty Thousand Dollars and No Cents**

VOID AFTER 90 DAYS

NAME AND TITLE

**MIRIAM BARR**

**CASHIER'S CHECK**

PRINTED NAME AND TITLE

⑆ 2160070⑆ ⑈086300012⑇ ⑆902000705⑆

THIS DOCUMENT HAS A COLORED BACKGROUND - NOT A WHITE BACKGROUND

Exhibit "2"

## ALTA COMMITMENT FOR TITLE INSURANCE

Issued By:

CHICAGO TITLE INSURANCE COMPANY

Commitment Number:

**22NW1701394WF**

### NOTICE

**IMPORTANT - READ CAREFULLY:** THIS COMMITMENT IS AN OFFER TO ISSUE ONE OR MORE TITLE INSURANCE POLICIES. ALL CLAIMS OR REMEDIES SOUGHT AGAINST THE COMPANY INVOLVING THE CONTENT OF THIS COMMITMENT OR THE POLICY MUST BE BASED SOLELY IN CONTRACT.

THIS COMMITMENT IS NOT AN ABSTRACT OF TITLE, REPORT OF THE CONDITION OF TITLE, LEGAL OPINION, OPINION OF TITLE, OR OTHER REPRESENTATION OF THE STATUS OF TITLE. THE PROCEDURES USED BY THE COMPANY TO DETERMINE INSURABILITY OF THE TITLE, INCLUDING ANY SEARCH AND EXAMINATION, ARE PROPRIETARY TO THE COMPANY, WERE PERFORMED SOLELY FOR THE BENEFIT OF THE COMPANY, AND CREATE NO EXTRACONTRACTUAL LIABILITY TO ANY PERSON, INCLUDING A PROPOSED INSURED.

THE COMPANY'S OBLIGATION UNDER THIS COMMITMENT IS TO ISSUE A POLICY TO A PROPOSED INSURED IDENTIFIED IN SCHEDULE A IN ACCORDANCE WITH THE TERMS AND PROVISIONS OF THIS COMMITMENT. THE COMPANY HAS NO LIABILITY OR OBLIGATION INVOLVING THE CONTENT OF THIS COMMITMENT TO ANY OTHER PERSON.

### COMMITMENT TO ISSUE POLICY

Subject to the Notice; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and the Commitment Conditions, Chicago Title Insurance Company, a Florida corporation (the "Company"), commits to issue the Policy according to the terms and provisions of this Commitment. This Commitment is effective as of the Commitment Date shown in Schedule A for each Policy described in Schedule A, only when the Company has entered in Schedule A both the specified dollar amount as the Proposed Policy Amount and the name of the Proposed Insured.

If all of the Schedule B, Part I-Requirements have not been met within one hundred eighty (180) days after the Commitment Date, this Commitment terminates and the Company's liability and obligation end.

**Chicago Title Insurance Company**

By:

Michael J. Nolan, President

Attest:

Marjorie Nemzura, Secretary

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright American Land Title Association. All rights reserved.

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

AMERICAN
LAND TITLE
ASSOCIATION

ALTA Commitment for Title Insurance (08/01/2016)

Printed: 06.20.22 @ 11:48 AM
IL-CT-FWET-01080.225034-SPS-1-22-22NW1701394WF

**CHICAGO TITLE INSURANCE COMPANY**                    **COMMITMENT NO. 22NW1701394WF**

*Transaction Identification Data for reference only:*

| ORIGINATING OFFICE: | FOR SETTLEMENT INQUIRIES, CONTACT: |
|---|---|
| Chicago Title Company, LLC<br>2441 Warrenville Rd, Suite 100<br>Lisle, IL 60532<br>Main Phone: (630)871-3500<br>Email: CTLisle@ctt.com | Chicago Title and Trust Company<br>2441 Warrenville Rd, Suite 100<br>Lisle, IL 60532<br>Main Phone: (630)871-3500   Main Fax: (630)871-3587 |

Issued By:    Illinois Title Company
              1900 Spring Rd, Ste 200
              Oak Brook, IL 60523

**Order Number:  22NW1701394WF**

Property Ref.:    5403 LaGrange Road, Countryside, IL 60525

## SCHEDULE A

1. Commitment Date: May 6, 2022

2. Policy to be issued:

   (a) ALTA Owner's Policy 2006
       Proposed Insured:          Purchaser with contractual rights under a purchase agreement with the vested owner
                                  identified at Item 4 below
       Proposed Policy Amount:   $100,000.00

   (b) ALTA Loan Policy 2006
       Proposed Insured:          Lender with a contractual obligation under a loan agreement with the Proposed
                                  Insured, its successors and/or assigns as their respective interests may appear
       Proposed Policy Amount:   $10,000.00

3. The estate or interest in the Land described or referred to in this Commitment is:

   Fee Simple

4. The Title is, at the Commitment Date, vested in:

   Guadalupe Arce

5. The Land is described as follows:

   LOTS 1 AND 2 IN BLOCK 8 IN SHERMAN GARDENS SUBDIVISION, BEING IN THE SOUTHEAST 1/4 OF
   SECTION 9, TOWNSHIP 38 NORTH, RANGE 12, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK
   COUNTY, ILLINOIS;

   AND

   LOTS 31 AND 32 IN BLOCK 8 IN SHERMAN GARDENS SUBDIVISION, BEING IN THE SOUTHEAST 1/4 OF
   SECTION 9, TOWNSHIP 38 NORTH, RANGE 12, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK
   COUNTY, ILLINOIS.

### END OF SCHEDULE A

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its Issuing agent that may be in electronic form.*

Copyright American Land Title Association. All rights reserved.

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as
of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

ALTA Commitment for Title Insurance (08/01/2016)                                    Printed: 06.20.22 @ 11:48 AM

**CHICAGO TITLE INSURANCE COMPANY**                    **COMMITMENT NO. 22NW1701394WF**

### SCHEDULE B, PART I
### REQUIREMENTS

All of the following Requirements must be met:

1.  The Proposed Insured must notify the Company in writing of the name of any party not referred to in this Commitment who will obtain an interest in the Land or who will make a loan on the Land.  The Company may then make additional Requirements or Exceptions.

2.  Pay the agreed amount for the estate or interest to be insured.

3.  Pay the premiums, fees, and charges for the Policy to the Company.

4.  Documents satisfactory to the Company that convey the Title or create the Mortgage to be insured, or both, must be properly authorized, executed, delivered, and recorded in the Public Records.

5.  Notice: Please be aware that due to the conflict between federal and state laws concerning the cultivation, distribution, manufacture or sale of marijuana, the Company is not able to close or insure any transaction involving Land that is associated with these activities.

6.  **The Proposed Policy Amount(s) must be increased to the full value of the estate or interest being insured, and any additional premium must be paid at that time. An Owner's Policy should reflect the purchase price or full value of the Land. A Loan Policy should reflect the loan amount or value of the property as collateral. Proposed Policy Amount(s) will be revised and premiums charged consistent therewith when the final amounts are approved.**

7.  Be advised that the "good funds" of the title insurance act (215 ILCS 155/26) became effective 1-1-2010. This act places limitations upon the settlement agent's ability to accept certain types of deposits into escrow. Please contact your local Chicago Title office regarding the application of this new law to your transaction.

8.  Effective June 1, 2009, pursuant to Public Act 95-988, satisfactory evidence of identification must be presented for the notarization of any and all documents notarized by an Illinois notary public. Satisfactory identification documents are documents that are valid at the time of the notarial act; are issued by a state or federal government agency; bear the photographic image of the individual's face; and bear the individual's signature.

9.  The Company may pay current year Cook County taxes when furnished an original tax bill at or before the time the Company is requested to make payments.  If an original tax bill is not furnished, the Company will pay current taxes via ACH payment, which results in an additional $8.00 duplicate tax bill fee payable to Cook County and collected from the taxpayer at closing.

10. Note: The land lies within a county which is subject to the Predatory Lending Database Act (765 ILCS 77/70 et seq. as amended). A Certificate of Compliance with the act or a Certificate of Exemption therefrom must be obtained at time of closing in order for the Company to record any insured mortgage.  If the closing is not conducted by the company, a certificate of compliance or a certificate of exemption must be attached to any mortgage to be recorded.

    Note: for Cook, Kane, Will and Peoria counties, the act applies to mortgages recorded on or after July 1, 2010.

11. The Company should be furnished a statement that there is no property manager employed to manage the Land,

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright American Land Title Association. All rights reserved.

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

## CHICAGO TITLE INSURANCE COMPANY

**COMMITMENT NO. 22NW1701394WF**

### SCHEDULE B, PART I
### REQUIREMENTS
(continued)

or, in the alternative, a final lien waiver from any such property manager.

12.  The Company should be provided a statement from the borrower(s) relative to any mortgage identified in Schedule B disclosing whether the borrower(s) have entered into any forbearance or loan modification agreement with the lender relative to delayed or postponed payments or other restructuring of the debt secured by the mortgage.

13.  For each policy to be issued as identified in Schedule A, Item 2; the Company shall not be liable under this commitment until it receives a designation for a Proposed Insured, acceptable to the Company. The Company may amend this commitment to add, among other things, additional exceptions or requirements after the designation of the Proposed Insured.

### END OF SCHEDULE B, PART I

**Title Insurance Agent:**

Illinois Title Company
1900 Spring Rd, Ste 200
Oak Brook, IL 60523
Phone:  (630)571-1900
Fax:    (630)571-1042

_____
Authorized Signatory

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

**CHICAGO TITLE INSURANCE COMPANY**                    **COMMITMENT NO. 22NW1701394WF**

## SCHEDULE B, PART II
## EXCEPTIONS

THIS COMMITMENT DOES NOT REPUBLISH ANY COVENANT, CONDITION, RESTRICTION, OR LIMITATION CONTAINED IN ANY DOCUMENT REFERRED TO IN THIS COMMITMENT TO THE EXTENT THAT THE SPECIFIC COVENANT, CONDITION, RESTRICTION, OR LIMITATION VIOLATES STATE OR FEDERAL LAW BASED ON RACE, COLOR, RELIGION, SEX, SEXUAL ORIENTATION, GENDER IDENTITY, HANDICAP, FAMILIAL STATUS, OR NATIONAL ORIGIN.

The Policy will not insure against loss or damage resulting from the terms and provisions of any lease or easement identified in Schedule A, and will include the following Exceptions unless cleared to the satisfaction of the Company:

**General Exceptions**

1.   **Rights or claims of parties in possession not shown by Public Records.**

2.   **Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the title that would be disclosed by an accurate and complete land survey of the Land.**

3.   **Easements, or claims of easements, not shown by the Public Records.**

4.   **Any lien, or right to a lien, for services, labor or material heretofore or hereafter furnished, imposed by law and not shown by the Public Records.**

5.   **Taxes or special assessments which are not shown as existing liens by the Public Records.**

6.   **We should be furnished a properly executed ALTA statement and, unless the land insured is a condominium unit, a survey if available. Matters disclosed by the above documentation will be shown specifically.**

7.   Any defect, lien, encumbrance, adverse claim, or other matter that appears for the first time in the Public Records or is created, attaches, or is disclosed between the Commitment Date and the date on which all of the Schedule B, Part I-Requirements are met.

Q    8.

      1.   Taxes for the year(s) 2021 and 2022
           2022 taxes are not yet due or payable.

      1A.  Note: 2021 first installment was due March 1, 2022
           Note: 2021 final Installment not yet due or payable

| Perm tax# | Pcl | Year | 1st Inst | Stat |
|---|---|---|---|---|
| 18-09-412-001-0000 | 1 of 4 | 2021 | $18,427.59 | Paid |
| 18-09-412-002-0000 | 2 of 4 | 2021 | $9,588.30 | Paid |
| 18-09-412-022-0000 | 3 of 4 | 2021 | $2,586.51 | Paid |
| 18-09-412-023-0000 | 4 of 4 | 2021 | $2,506.13 | Paid |

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

ALTA Commitment for Title Insurance (08/01/2016)



**CHICAGO TITLE INSURANCE COMPANY**                    **COMMITMENT NO. 22NW1701394WF**

### SCHEDULE B, PART II
### EXCEPTIONS
(continued)

B    9.    Mortgage dated October 11, 2016 and recorded October 28, 2016 as Document No. 1630213002 made by Guadalupe Arce to Second Federal, a division of Self-Help Federal Credit Union to secure an indebtedness in the amount of $1,749,187.00.

E    10.   The names of the Proposed Insured should be provided in order that a judgment search can be made against parties prior to the execution and recording of the Deed and Mortgage to be insured, if any.

G    11.   Existing unrecorded leases and all rights thereunder of the lessees and of any person or party claiming by, through or under the lessees.

H    12.   Any lien, or right to a lien, for services, labor or material heretofore or hereafter furnished, imposed by law and not shown by the Public Records.

I    13.   If work has been performed on the Land within the last six months which may subject the Land to liens under the mechanics lien laws, the Company should be furnished satisfactory evidence that those who have performed such work have been fully paid and have waived their rights to a lien. If evidence is not provided or is unsatisfactory, this commitment/policy will be subject to the following exception:

Any lien, or right to a lien, for services, labor or material, heretofore or hereafter furnished, imposed by law, and not shown by the Public Records.

The Company reserves the right to add additional items or make further requirements after review of the requested documentation.

F    14.   Municipal Real Estate Transfer Tax Stamps (or proof of exemption) must accompany any conveyance and certain other transfers of property located in Countryside. Please contact said municipality prior to closing for its specific requirements, which may include the payment of fees, an inspection or other approvals.

J    15.   Covenants and restrictions (but omitting any such covenant or restriction based on race, color, religion, sex, handicap, familial status or national origin unless and only to the extent that said covenant (a) is exempt under Chapter 42, Section 3607 of the United States Code or (b) relates to handicap but does not discriminate against handicapped persons), contained in the document recorded February 27, 1930 as Document No. 10603039 which does not contain a reversionary or forfeiture clause.

K    16.   Building line of 25 feet as shown on the Plat of Subdivision.

(Affects Lots 31 and 32)

L    17.   Encroachment of the brick entryway located mainly on the Land onto the property West and adjoining by approximately 2.65 feet to 2.89 feet, more or less, as shown on Plat of Survey.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright American Land Title Association. All rights reserved.

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

ALTA Commitment for Title Insurance (08/01/2016)

**CHICAGO TITLE INSURANCE COMPANY**                    **COMMITMENT NO. 22NW1701394WF**

## SCHEDULE B, PART II
## EXCEPTIONS
(continued)

M    **18.**    Encroachment of the planter located mainly on the Land onto the property North and adjoining by an undisclosed amount, as shown on Plat of Survey.

N    **19.**    Encroachment of the brick and frame building located mainly on the Land onto the property South and adjoining by approximately 0.13 feet to 0.17 feet, more or less, as shown on Plat of Survey.

O    **20.**    Encroachment of the frame canopy located mainly on the Land onto the property North and adjoining by approximately 0.07 feet, as shown on Plat of Survey.

P    **21.**    All endorsement requests should be made prior to closing to allow ample time for the company to examine required documentation.
(This note will be waived for policy).

### END OF SCHEDULE B, PART II

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association. All rights reserved.**

The use of this Form (any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

**CHICAGO TITLE INSURANCE COMPANY**　　　　　　　　**COMMITMENT NO. 22NW1701394WF**

## COMMITMENT CONDITIONS

1. **DEFINITIONS**
   (a) "Knowledge" or "Known": Actual or imputed knowledge, but not constructive notice imparted by the Public Records.
   (b) "Land": The land described in Schedule A and affixed improvements that by law constitute real property. The term "Land" does not include any property beyond the lines of the area described in Schedule A, nor any right, title, interest, estate, or easement in abutting streets, roads, avenues, alleys, lanes, ways, or waterways, but this does not modify or limit the extent that a right of access to and from the Land is to be insured by the Policy.
   (c) "Mortgage": A mortgage, deed of trust, or other security instrument, including one evidenced by electronic means authorized by law.
   (d) "Policy": Each contract of title insurance, in a form adopted by the American Land Title Association, issued or to be issued by the Company pursuant to this Commitment.
   (e) "Proposed Insured": Each person identified in Schedule A as the Proposed Insured of each Policy to be issued pursuant to this Commitment.
   (f) "Proposed Policy Amount": Each dollar amount specified in Schedule A as the Proposed Policy Amount of each Policy to be issued pursuant to this Commitment.
   (g) "Public Records": Records established under state statutes at the Commitment Date for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without Knowledge.
   (h) "Title": The estate or interest described in Schedule A.
2. If all of the Schedule B, Part I-Requirements have not been met within the time period specified in the Commitment to Issue Policy, this Commitment terminates and the Company's liability and obligation end.
3. The Company's liability and obligation is limited by and this Commitment is not valid without:
   (a) the Notice;
   (b) the Commitment to Issue Policy;
   (c) the Commitment Conditions;
   (d) Schedule A;
   (e) Schedule B, Part I-Requirements;
   (f) Schedule B, Part II-Exceptions; and
   (g) a counter-signature by the Company or its issuing agent that may be in electronic form.
4. **COMPANY'S RIGHT TO AMEND**
   The Company may amend this Commitment at any time. If the Company amends this Commitment to add a defect, lien, encumbrance, adverse claim, or other matter recorded in the Public Records prior to the Commitment Date, any liability of the Company is limited by Commitment Condition 5. The Company shall not be liable for any other amendment to this Commitment.
5. **LIMITATIONS OF LIABILITY**
   (a) The Company's liability under Commitment Condition 4 is limited to the Proposed Insured's actual expense incurred in the interval between the Company's delivery to the Proposed Insured of the Commitment and the delivery of the amended Commitment, resulting from the Proposed Insured's good faith reliance to:
       (i) comply with the Schedule B, Part I-Requirements;
       (ii) eliminate, with the Company's written consent, any Schedule B, Part II-Exceptions; or
       (iii) acquire the Title or create the Mortgage covered by this Commitment.
   (b) The Company shall not be liable under Commitment Condition 5(a) if the Proposed Insured requested the amendment or had Knowledge of the matter and did not notify the Company about it in writing.
   (c) The Company will only have liability under Commitment Condition 4 if the Proposed Insured would not have incurred the expense had the Commitment included the added matter when the Commitment was first delivered to the Proposed Insured.
   (d) The Company's liability shall not exceed the lesser of the Proposed Insured's actual expense incurred in good faith and described in Commitment Conditions 5(a)(i) through 5(a)(iii) or the Proposed Policy Amount.
   (e) The Company shall not be liable for the content of the Transaction Identification Data, if any.
   (f) In no event shall the Company be obligated to issue the Policy referred to in this Commitment unless all of the Schedule B, Part I-Requirements have been met to the satisfaction of the Company.
   (g) In any event, the Company's liability is limited by the terms and provisions of the Policy.
6. **LIABILITY OF THE COMPANY MUST BE BASED ON THIS COMMITMENT**
   (a) Only a Proposed Insured identified in Schedule A, and no other person, may make a claim under this Commitment.
   (b) Any claim must be based in contract and must be restricted solely to the terms and provisions of this Commitment.

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright American Land Title Association. All rights reserved.

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

ALTA Commitment for Title Insurance (08/01/2016)

Printed: 06.20.22 @ 11:48 AM
IL-CT-FWET-01080.225034-SPS-1-22-22NW1701394WF

**CHICAGO TITLE INSURANCE COMPANY**                    **COMMITMENT NO. 22NW1701394WF**

(continued)

(c)   Until the Policy is issued, this Commitment, as last revised, is the exclusive and entire agreement between the parties with respect to the subject matter of this Commitment and supersedes all prior commitment negotiations, representations, and proposals of any kind, whether written or oral, express or implied, relating to the subject matter of this Commitment.

(d)   The deletion or modification of any Schedule B, Part II-Exception does not constitute an agreement or obligation to provide coverage beyond the terms and provisions of this Commitment or the Policy.

(e)   Any amendment or endorsement to this Commitment must be in writing and authenticated by a person authorized by the Company.

(f)   When the Policy is issued, all liability and obligation under this Commitment will end and the Company's only liability will be under the Policy.

**7.   IF THIS COMMITMENT HAS BEEN ISSUED BY AN ISSUING AGENT**
The issuing agent is the Company's agent only for the limited purpose of issuing title insurance commitments and policies.  The issuing agent is not the Company's agent for the purpose of providing closing or settlement services.

**8.   PRO-FORMA POLICY**
The Company may provide, at the request of a Proposed Insured, a pro-forma policy illustrating the coverage that the Company may provide.  A pro-forma policy neither reflects the status of Title at the time that the pro-forma policy is delivered to a Proposed Insured, nor is it a commitment to insure.

**9.   ARBITRATION**
The Policy contains an arbitration clause.  All arbitrable matters when the Proposed Policy Amount is Two Million And No/100 Dollars ($2,000,000.00) or less shall be arbitrated at the option of either the Company or the Proposed Insured as the exclusive remedy of the parties.  A Proposed Insured may review a copy of the arbitration rules at http://www.alta.org/arbitration.

**END OF CONDITIONS**

**1031 EXCHANGE SERVICES**

**If your transaction involves a tax deferred exchange, we offer this service through our 1031 division, IPX1031.  As the nation's largest 1031 company, IPX1031 offers guidance and expertise.  Security for Exchange funds includes segregated bank accounts and a 100 million dollar Fidelity Bond.  Fidelity National Title Group also provides a 50 million dollar Performance Guaranty for each Exchange.  For additional information, or to set-up an Exchange, please call Scott Nathanson at (312)223-2178 or Anna Barsky at (312)223-2169.**

*This page is only a part of a 2016 ALTA® Commitment for Title Insurance issued by Chicago Title Insurance Company.  This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright American Land Title Association.  All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use.  All other uses are prohibited.  Reprinted under license from the American Land Title Association.

ALTA Commitment for Title Insurance (08/01/2016)
Printed: 06.20.22 @ 11:48 AM
IL-CT-FWET-01080.225034-SPS-1-22-22NW1701394WF

 Inquire before you wire!

## WIRE FRAUD ALERT

This Notice is not intended to provide legal or professional advice.
If you have any questions, please consult with a lawyer.

All parties to a real estate transaction are targets for wire fraud and many have lost hundreds of thousands of dollars because they simply relied on the wire instructions received via email, without further verification. **If funds are to be wired in conjunction with this real estate transaction, we strongly recommend verbal verification of wire instructions through a known, trusted phone number prior to sending funds.**

In addition, the following non-exclusive self-protection strategies are recommended to minimize exposure to possible wire fraud.

* **NEVER RELY** on emails purporting to change wire instructions. Parties to a transaction rarely change wire instructions in the course of a transaction.

* **ALWAYS VERIFY** wire instructions, specifically the ABA routing number and account number, by calling the party who sent the instructions to you. DO NOT use the phone number provided in the email containing the instructions, use phone numbers you have called before or can otherwise verify. **Obtain the number of relevant parties to the transaction as soon as an escrow account is opened.** DO NOT send an email to verify as the email address may be incorrect or the email may be intercepted by the fraudster.

* **USE COMPLEX EMAIL PASSWORDS** that employ a combination of mixed case, numbers, and symbols. Make your passwords greater than eight (8) characters. Also, change your password often and do NOT reuse the same password for other online accounts.

* **USE MULTI-FACTOR AUTHENTICATION** for email accounts. Your email provider or IT staff may have specific instructions on how to implement this feature.

For more information on wire-fraud scams or to report an incident, please refer to the following links:

*Federal Bureau of Investigation:*
http://www.fbi.gov

*Internet Crime Complaint Center:*
http://www.ic3.gov

Wire Fraud Alert
Original Effective Date:  5/11/2017
Current Version Date:  5/11/2017

Page 10

22NW1701394WF - WIRE0016 (DSI Rev. 12/07/17)
*TM and © Fidelity National Financial, Inc. and/or an affiliate. All rights reserved*

## FIDELITY NATIONAL FINANCIAL
### PRIVACY NOTICE

Effective August 1, 2021

Fidelity National Financial, Inc. and its majority-owned subsidiary companies (collectively, "FNF," "our," or "we") respect and are committed to protecting your privacy. This Privacy Notice explains how we collect, use, and protect personal information, when and to whom we disclose such information, and the choices you have about the use and disclosure of that information.

A limited number of FNF subsidiaries have their own privacy notices. If a subsidiary has its own privacy notice, the privacy notice will be available on the subsidiary's website and this Privacy Notice does not apply.

<u>Collection of Personal Information</u>

FNF may collect the following categories of Personal Information:

*   contact information (*e.g.*, name, address, phone number, email address);
*   demographic information (*e.g.*, date of birth, gender, marital status);
*   identity information (*e.g.* Social Security Number, driver's license, passport, or other government ID number);
*   financial account information (*e.g.* loan or bank account information); and
*   other personal information necessary to provide products or services to you.

We may collect Personal Information about you from:

*   information we receive from you or your agent;
*   information about your transactions with FNF, our affiliates, or others; and
*   information we receive from consumer reporting agencies and/or governmental entities, either directly from these entities or through others.

<u>Collection of Browsing Information</u>

FNF automatically collects the following types of Browsing Information when you access an FNF website, online service, or application (each an "FNF Website") from your Internet browser, computer, and/or device:

*   Internet Protocol (IP) address and operating system;
*   browser version, language, and type;
*   domain name system requests; and
*   browsing history on the FNF Website, such as date and time of your visit to the FNF Website and visits to the pages within the FNF Website.

Like most websites, our servers automatically log each visitor to the FNF Website and may collect the Browsing Information described above. We use Browsing Information for system administration, troubleshooting, fraud investigation, and to improve our websites. Browsing Information generally does not reveal anything personal about you, though if you have created a user account for an FNF Website and are logged into that account, the FNF Website may be able to link certain browsing activity to your user account.

<u>Other Online Specifics</u>

<u>Cookies</u>. When you visit an FNF Website, a "cookie" may be sent to your computer. A cookie is a small piece of data that is sent to your Internet browser from a web server and stored on your computer's hard drive. Information gathered using cookies helps us improve your user experience. For example, a cookie can help the website load properly or can customize the display page based on your browser type and user preferences. You can choose whether or not to accept cookies by changing your Internet browser settings. Be aware that doing so may impair or limit some functionality of the FNF Website.

<u>Web Beacons</u>. We use web beacons to determine when and how many times a page has been viewed. This information is used to improve our websites.

<u>Do Not Track</u>. Currently our FNF Websites do not respond to "Do Not Track" features enabled through your browser.

Links to Other Sites. FNF Websites may contain links to unaffiliated third-party websites. FNF is not responsible for the privacy practices or content of those websites. We recommend that you read the privacy policy of every website you visit.

## Use of Personal Information

FNF uses Personal Information for three main purposes:

* To provide products and services to you or in connection with a transaction involving you.
* To improve our products and services.
* To communicate with you about our, our affiliates', and others' products and services, jointly or independently.

## When Information Is Disclosed

We may disclose your Personal Information and Browsing Information in the following circumstances:

* to enable us to detect or prevent criminal activity, fraud, material misrepresentation, or nondisclosure;
* to nonaffiliated service providers who provide or perform services or functions on our behalf and who agree to use the information only to provide such services or functions;
* to nonaffiliated third party service providers with whom we perform joint marketing, pursuant to an agreement with them to jointly market financial products or services to you;
* to law enforcement or authorities in connection with an investigation, or in response to a subpoena or court order; or
* in the good-faith belief that such disclosure is necessary to comply with legal process or applicable laws, or to protect the rights, property, or safety of FNF, its customers, or the public.

The law does not require your prior authorization and does not allow you to restrict the disclosures described above. Additionally, we may disclose your information to third parties for whom you have given us authorization or consent to make such disclosure. We do not otherwise share your Personal Information or Browsing Information with nonaffiliated third parties, except as required or permitted by law. We may share your Personal Information with affiliates (other companies owned by FNF) to directly market to you. Please see "Choices with Your Information" to learn how to restrict that sharing.

We reserve the right to transfer your Personal Information, Browsing Information, and any other information, in connection with the sale or other disposition of all or part of the FNF business and/or assets, or in the event of bankruptcy, reorganization, insolvency, receivership, or an assignment for the benefit of creditors. By submitting Personal Information and/or Browsing Information to FNF, you expressly agree and consent to the use and/or transfer of the foregoing information in connection with any of the above described proceedings.

## Security of Your Information

We maintain physical, electronic, and procedural safeguards to protect your Personal Information.

## Choices With Your Information

If you do not want FNF to share your information among our affiliates to directly market to you, you may send an "opt out" request as directed at the end of this Privacy Notice. We do not share your Personal Information with nonaffiliates for their use to direct market to you without your consent.

Whether you submit Personal Information or Browsing Information to FNF is entirely up to you. If you decide not to submit Personal Information or Browsing Information, FNF may not be able to provide certain services or products to you.

For California Residents: We will not share your Personal Information or Browsing Information with nonaffiliated third parties, except as permitted by California law. For additional information about your California privacy rights, please visit the "California Privacy" link on our website (https://fnf.com/pages/californiaprivacy.aspx) or call (888) 413-1748.

For Nevada Residents: You may be placed on our internal Do Not Call List by calling (888)714-2710 or by contacting us via the information set forth at the end of this Privacy Notice. Nevada law requires that we also provide you with the following contact information: Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington St., Suite 3900, Las Vegas, NV 89101; Phone number: (702) 486-3132; email: BCPINFO@ag.state.nv.us.

For Oregon Residents: We will not share your Personal Information or Browsing Information with nonaffiliated third parties for marketing purposes, except after you have been informed by us of such sharing and had an opportunity to indicate that you do not want a disclosure made for marketing purposes.

For Vermont Residents: We will not disclose information about your creditworthiness to our affiliates and will not disclose your personal information, financial information, credit report, or health information to nonaffiliated third parties to market to you, other than as permitted by Vermont law, unless you authorize us to make those disclosures.

## Information From Children

The FNF Websites are not intended or designed to attract persons under the age of eighteen (18). We do not collect Personal Information from any person that we know to be under the age of thirteen (13) without permission from a parent or guardian.

## International Users

FNF's headquarters is located within the United States. If you reside outside the United States and choose to provide Personal Information or Browsing Information to us, please note that we may transfer that information outside of your country of residence. By providing FNF with your Personal Information and/or Browsing Information, you consent to our collection, transfer, and use of such information in accordance with this Privacy Notice.

## FNF Website Services for Mortgage Loans

Certain FNF companies provide services to mortgage loan servicers, including hosting websites that collect customer information on behalf of mortgage loan servicers (the "Service Websites"). The Service Websites may contain links to both this Privacy Notice and the mortgage loan servicer or lender's privacy notice. The sections of this Privacy Notice titled When Information Is Disclosed, Choices with Your Information, and Accessing and Correcting Information do not apply to the Service Websites. The mortgage loan servicer or lender's privacy notice governs use, disclosure, and access to your Personal Information. FNF does not share Personal Information collected through the Service Websites, except as required or authorized by contract with the mortgage loan servicer or lender, or as required by law or in the good-faith belief that such disclosure is necessary: to comply with a legal process or applicable law, to enforce this Privacy Notice, or to protect the rights, property, or safety of FNF or the public.

## Your Consent To This Privacy Notice; Notice Changes

By submitting Personal Information and/or Browsing Information to FNF, you consent to the collection and use of the information in accordance with this Privacy Notice. We may change this Privacy Notice at any time. The Privacy Notice's effective date will show the last date changes were made. If you provide information to us following any change of the Privacy Notice, that signifies your assent to and acceptance of the changes to the Privacy Notice.

## Accessing and Correcting Information; Contact Us

If you have questions, would like to correct your Personal Information, or want to opt-out of information sharing for affiliate marketing, visit FNF's Opt Out Page or contact us by phone at (888) 714-2710 or by mail to:

Fidelity National Financial, Inc.
601 Riverside Avenue,
Jacksonville, Florida 32204
Attn: Chief Privacy Officer